## ESBECO DISTILLING CORPORATION v. OWINGS MILLS DISTILLERY, Inc.

### No. 1277.

District Court, D. Maryland.
Feb. 18, 1942.

382

Cornelius P. Mundy, of Baltimore, Md., for plaintiff.

S. Ralph Warnken and Samuel Polonsky, both of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit for damages on account of alleged breach of warranty involved in the purchase by the plaintiff, Esbeco Distilling Corporation, of 421 barrels of so-called Owings Mills Maryland Rye whiskey, from the defendant, the Owings Mills Distillery, Inc.

No federal questions are involved, the jurisdiction of this court being rested solely on diversity of citizenship and amount involved, the plaintiff being a corporation of Delaware, and the defendant a corporation of Maryland.

The plaintiff, with offices in Stamford, Connecticut, is in the business of blending, bottling and selling whiskey, and the defendant is a distiller with its plant at Owings Mills, Maryland. Plaintiff contends that it made known to defendant the purposes for which the whiskey was required, but that it has been found not to be reasonably fit for those purposes so that there was a breach of implied warranty as to the fitness of the goods for the purposes stated; furthermore, that the whiskey was bought by description and that there was a breach of implied warranty that the whiskey was of merchantable quality; and that as a result of its inferior quality and unsuitability for the purposes required, the plaintiff has lost approximately $18,000, representing what it paid for the whiskey, plus taxes, storage, insurance and interest. Although not raised in the pleadings, in the course of the trial plaintiff's counsel, relying upon Rule 15(b) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, raised, and the Court considered, and heard testimony upon, the issue of whether defendant was also liable with respect to at least part of the whiskey, because of defendant's status as a warehouseman, and its issuance and endorsement of warehouse receipts with respect thereto, on the ground of alleged failure to use due care in the custody of the whiskey, and of alleged breach of warranty of its merchantability and fitness for its intended use.

Defendant has set up the following defenses: (1) Limitations; (2) denial of breach of warranty as seller, either express or implied; (3) that, assuming there may have been such breach, plaintiff failed to give defendant notice of it within a reasonable time after plaintiff's officers or representatives knew, or ought to have known, of such breach; (4) that as to 96 of the barrels of whiskey, no warranties can be asserted by the plaintiff because it was a sub-vendee of these barrels in the open market; and (5) denial of negligence and breach of warranty as warehouseman of these 96 barrels.

 The plea of limitations based upon the three year provision of the Maryland statute, Annotated Code of Maryland, Article 57, Sec. 1, was raised separately by a motion of defendant to dismiss the bill of complaint on this ground, and, after hearing, at which testimony was taken, the

motion was overruled. Part of the whiskey was purchased under a written agreement which was made in Maryland, and the rest was also purchased in Maryland through warehouse receipts, so Maryland law governs. It was determined that the cause of action did not arise immediately upon the purchase of the whiskey because by the law of Maryland, Uniform Sales Act, Annotated Code of Maryland, Art. 83, Secs. 37, Rule 3(2)(b) and 65(1), a purchaser, such as plaintiff, is entitled to a reasonable time within which to call for samples, to inspect them, and to determine whether to accept or reject the whiskey. The Court further found that, with respect to all of the 421 barrels, three years in addition to such reasonable time had not elapsed before suit was brought on July 23, 1941, since, by the great weight of the more credible evidence as to the custom of the trade, it was reasonable to allow not less than two years from date of distillation for maturing whiskey of this type and grade, before requiring that samples be taken and inspected. So, there could be no doubt about the timeliness of this suit with respect to 96 barrels distilled in 1937 and purchased in the open market, part in 1939 and the rest in 1940; and also with respect to the remaining 325 barrels which were likewise distilled in 1937, and were purchased the same year by contract with defendant. Thus, with respect to all of the 421 barrels the statutory three year period "from the time the cause of action accrued", which was never earlier than the year 1939, had not expired when suit was brought.

Accordingly, defendant's motion to dismiss the bill of complaint on the ground of limitations having been denied, the case proceeded to trial on the other issues above enumerated.

At the outset, a somewhat more precise exposition of how and where the whiskey was produced, and how and when purchased by the plaintiff, would seem to be desirable.

As already stated, the bill of complaint embraces a total of 421 barrels. Of these, 325 were purchased pursuant to a formal written agreement between plaintiff and defendant. This contract bears date of May 1, 1937. The remaining 96 barrels were purchased in the open market. The 325, or what we will hereafter call the "contract" barrels, were produced by the defendant expressly for the plaintiff in the latter's name, and were placed in an in-ternal revenue bonded warehouse at Owings Mills, Maryland, which the Terminal Warehouse Company of Baltimore City leased from the defendant. Negotiable warehouse receipts of the Terminal Company were issued originally to the plaintiff for these barrels. The contract called for production by the defendant, and purchase by the plaintiff, of approximately 110 barrels each month during the year 1937, commencing with the month of May, and omitting July and August at defendant's option. It appears that defendant did not produce the full quota of 110 barrels a month and that this under-production was made the subject, in 1938, of arbitration along with other questions also not here involved, arising out of this same contract and also a contract for whiskey distilled by defendant in 1936. So we are not here concerned with the failure on the part of the defendant to produce and tender the full monthly quota provided by the contract here in issue. As regards payment, the contract provided for installment payments, all balances due to be paid at the end of nine months from the date of the respective distillations. It appears that plaintiff did pay for all of the 325 barrels, including taxes, storage, insurance and interest.

Of the remaining 96 barrels, 12 were produced by the defendant for itself and then sold to Consolidated Distillers Corporation by warehouse receipts of the defendant, purporting to cover deposit of these barrels in defendant's own bonded warehouse at Owings Mills, Maryland. These receipts were purchased by the plaintiff from the above named company on February 11, 1939. An additional 37 barrels were also produced by the defendant for itself, were then sold to the C. B. Baker Company by defendant's warehouse receipts of like purport, which were purchased from the latter by the plaintiff on November 2nd, 1939. The remaining 47 barrels of the 96 barrel lot were likewise produced by the defendant but for the firm of Cluff & Pickering, warehouse receipts of like purport were issued for them by the defendant, which were indorsed to the above named concern and eventually purchased by the plaintiff on November 8, 1940, from the C. B. Baker Company. These 47 barrels are stamped with the name of Cluff & Pickering and the invoice from the C. B. Baker to the plaintiff refers to this whiskey as "private brand." Just as with respect to the "contract" barrels, it is not disputed that plaintiff has paid the full purchase

price for these 96 barrels, including taxes, storage, insurance and interest.

For convenience we will separate the case into two parts, the first dealing with the "contract" barrels covered by the formal contract between plaintiff and defendant, and the second, with the remaining 96 barrels which were purchased in the open market.

As to the "contract" barrels, as we have seen, defendant contends, in addition to denying that it has breached any warranty, express or implied, that even if there has been a breach of warranty, there can be no recovery, because plaintiff failed to give notice of such breach within a reasonable time after its officers or representatives knew or ought to have known of the breach. We will, therefore, consider this latter question first.

While the evidence on this point is quite voluminous, including a large amount of correspondence, some of which is so phrased as to be ambiguous and very confusing, our conclusion, after carefully reviewing it, is that defendant's contention must prevail, namely, that plaintiff did not act seasonably in bringing to defendant's attention its claim that the whiskey was not up to the specifications of the contract. It appears that on June 15, 1939, plaintiff first requested samples, expressing dissatisfaction with the quality of certain other whiskey distilled by the defendant. On June 17, this request was acknowledged by letter, and defendant promised to obtain the samples and forward them. For several days thereafter, letters went back and forth, the gist of which is that defendant explained that taking the samples would require some time, plaintiff on its part insisting, nevertheless, that they were essential. On June 27, defendant wrote to the Alcohol Tax Unit requesting permission to withdraw the requested samples. Then, on June 29, plaintiff complained further of the delay. On June 30th, defendant wrote that part of the samples were going forward that day and the Government's records, as well as those of the Railway Express Company, show that samples were taken and sent to plaintiff which he received on July 3rd. Then, on July 6th, plaintiff complained of the fact that only a small part of the requested samples had been received, and on the same date defendant replied, stating that the balance of the samples were being forwarded that day. Records similar to those just referred to, indicate that additional samples were taken and that they were received by plaintiff on July 7th, which appears to have completed the total number of samples requested of the "contract" barrels.

There appears to have been no dissatisfaction with the whiskey expressed to defendant, and plaintiff made no further request for samples until December 20, 1940, that is, approximately 17 months after receipt of the last samples just referred to, when plaintiff requested samples from the 96 barrels, and also from 120 of the barrels embraced in the "contract" lot which we are now considering, these 120 barrels having been distilled in September, 1937, and included in the barrels, samples of which had been requested by plaintiff in its letter of June 15, 1939, and had been supplied by defendant, as already explained. This letter of December 20, 1940, did not request any samples from the remaining 205 "contract" barrels, as to which, as also just explained, samples had previously been requested and received. As a matter of fact, no complaint about or rejection of the whiskey was made until February 10, 1941, which apparently was just about the time that plaintiff received the requested samples—five in all—the intervening delay of more than a month and a half having been due to defendant's and the Government agents' tardiness in taking the samples, for which plaintiff was not responsible. In the letter of February 10, 1941, plaintiff said:

"All of these five samples tested somewhat off. They have a very penetrating taste and smell from which we infer that they were distilled in a different manner and from a different formula than that of your regular heavy-bodied whiskey. Will you please inform us if this is correct?

"We have a motive in asking, i. e., that the goods were sold to us as your regular distillation of heavy bodied Rye. We will appreciate your definite information on this subject."

On February 11, 1941, defendant replied as follows:

"Answering your letter of February 10, #40532 is the same distillation as #40545. The items marked Cluff & Pickering were distilled under the name of Cluff & Pickering.

"We cannot tell you anything about the formulas that were used and who used them, nor can we tell you if the same formulas were used in all cases.

"We hope however that this information will help you." Then, on February 14th, plaintiff wrote as follows: "Thanks for your favor of the 11th, although we regret that you did not give us all the information we are seeking.

"We have 47 barrels distilled July 15/16, serials 40347/93, which we understand from your letter were distilled in the name of Cluff & Pickering.

"Then we have 12 barrels distilled July 23, 1937, serials 40545/56. Were these distilled in the name of Cluff & Pickering or some other lessee distiller? If so, whom?

"Also have 37 barrels, September, 1937, serials 41357/93. Were these distilled in the name of Cluff & Pickering, or some other lessee distiller? If so, whom?

"Can you tell us from your records whether any or all of the above lots were light bodied or heavy bodied?

"We bought direct from you, the following lots which were contracted to be heavy bodied standard Rye, i. e.,

"101 barrels—Serials 40111/211

"104 barrels—Serials 40212/315

"120 barrels—Serials 41778/897

"Out of the above three lots, you sent us a sample of 41778. This sample is the same character whiskey as described in ours of the 10th. It has a very penetrating ether taste and smell, and too much acidity. It is not similar to your regular run of heavy bodied Rye.

"Now you apparently delivered to us different whiskey from that which we bought and paid for, and we do not consider this whiskey sound and merchantable.

"We, therefore, respectfully request that you replace the above three lots with sound heavy bodied standard Rye. When you answer, please say definitely yes or not, if you will comply.

"The other lots mentioned in the first part of this letter were bought in the outside market, and about which we will write you later, without waiving any of our rights."

It is to be noted that whereas this letter states that the contract called for "heavy bodied standard rye," this whiskey is not so described in the contract. No later correspondence was disclosed. The sum and substance of the verbal testimony is that the parties could not get together on any satisfactory terms, and the present suit followed.

There were introduced in evidence the Regulations of the United States Treasury Department, Bureau of Internal Revenue, governing the warehousing of distilled spirits (Regulations 10, 1940). From these it appears that: "The District Supervisor may, upon application to him in each instance, authorize the warehouseman to furnish a sample of a given lot of spirits to a purchaser, where the spirits have been sold subject to approval as to quality.". Thus, plaintiff's case is weakened by reason of this Regulation and the fact that the plaintiff could have gone directly to the District Supervisor and requested, and he doubtless would have obtained, upon his own initiative, the desired samples.

Section 67 of the Uniform Sales Act, in effect in Maryland (Article 83, Ann.Code of Maryland, Section 67), is as follows: "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor." To the same effect is Section 66, defining what constitutes acceptance.

There can, of course, be no hard and fast rule for determining what is "a reasonable time" within the meaning of these provisions. The proper amount of time to be allowed must be determined in each case upon its own individual facts. The weight of the more credible evidence is that whiskey of the type and grade of that specified in the contract in suit was well matured and fully merchantable two years, or even less, after distillation. Plaintiff knew it was distilled in 1937— that year's distillation is what it expressly agreed to buy. When it received the samples in the summer of 1939, the whiskey had already been maturing for two years. Therefore, it does not seem reasonable for plaintiff to have taken, unhampered by defendant, nearly a year and a half in addition, before notifying defendant of his rejection. Obviously, it is the age of the whiskey when purchased that must govern "the days of grace" allowed the purchaser, not the date of pur-

chase. One purchasing five-year old whiskey, for example, needs, and therefore should be allowed only such time as is necessary to obtain and examine the samples. But where he purchases whiskey only a year old, he should be allowed sufficient time for its maturity before being required to sample it.

■ The fact that this lot of whiskey was, like the other lot of 96 barrels which was purchased in the open market, covered by warehouse receipts, in addition to the formal contract, does not, we conclude, alter the situation. The Maryland law contains a special provision governing distillery warehouses as follows, Art. 14A, Ann. Code of Maryland, Sec. 61: "Bonded warehouses of the United States, known as distillery warehouses, as defined by and existing under the laws of the United States of America and situated in this State, shall be deemed to be warehouses within the contemplation and meaning of this section, and such distillery warehouses shall be subject to all the provisions of this article [Uniform Warehouse Receipts Act] not inconsistent with the laws of the United States regulating the conduct and operation of such distillery warehouses, and all warehouse receipts issued after February 27, 1906, by such a distillery warehouse shall be governed by and subject to all the provisions of this article [Uniform Warehouse Receipts Act] as fully to all intents and purposes as the warehouse receipts of any other warehouseman, corporation or person conducting a general warehousing business in this State."

■■ It will be noted that this statute makes the warehouse receipts covering the "contract" barrels subject to the provisions of the Uniform Warehouse Receipts Act which is also part of the Maryland Code, Ann.Code of Maryland, Art. 14A. §§ 1 to 60, inclusive. There is nothing in this Act which, directly or indirectly, alters the provisions in the Uniform Sales Act which affect the present case, and therefore the latter Act governs the situation. Here the receipts were merely transferred, not negotiated, to the plaintiff, and Section 42 of Article 14A provides that: "A person to whom a receipt has been transferred, but not negotiated, acquires thereby, as against the transferor, the title of the goods, subject to the terms of any agreement with the transferor." The agreement is entirely silent as to duty of the buyer, after ac-

cepting the goods, to notify the seller of any alleged breach of any promise or warranty. Therefore, the provision of the Sales Act to which we have referred applies, because we have a buyer-seller relationship such as is governed by the provisions of that Act in the absence of provisions to the contrary contained in the agreement itself.

We now turn to a consideration of the remaining 96 barrels which were bought on the open market. 12 were produced by the defendant for itself and then sold to the Consolidated Distillers Corporation, Baltimore, by defendant's warehouse receipts, which were purchased by the plaintiff from the last named company on February 11, 1939. 37 barrels were likewise produced by the defendant for itself, were then sold to the C. B. Baker Company, Atlantic City, N. J., by defendant's warehouse receipts, which were purchased from the latter company by the plaintiff on November 2, 1939. The remaining 47 barrels were likewise produced by the defendant but for the firm of Cluff & Pickering; warehouse receipts were issued by the defendant, they were indorsed to Cluff & Pickering and were eventually purchased by the plaintiff on November 8, 1940, from the C. B. Baker Company. All of the warehouse receipts covering these 96 barrels merely described the barrels as containing "Owings Mills Maryland Pure Rye Whiskey"—that is, the same kind of whiskey as that purchased under the formal written contract, except the receipts covering 37 barrels, on which the words "Heavy Bodied" were added.

As to all of these 96 barrels defendant asserts, in addition to denying any breach of warranty, the same defense which we have just considered and found to be meritorious with respect to the "contract" barrels, namely, that plaintiff failed to give notice of breach of warranty within a reasonable time after its officers or representatives knew or ought to have known of such breach. Also, defendant contends that no warranties exist because plaintiff was a sub-vendee of these 96 barrels in the open market, and defendant also denies negligence or breach of any warranty in its capacity as warehouseman of these barrels.

Considering first the defense of failure to give seasonable notice of alleged breach of warranty as to the quality of the whis-

key, we reach the same conclusion reached with respect to the "contract" barrels, namely, we find that with respect to these 96 barrels, plaintiff did not notify defendant of the alleged breach of warranty within a reasonable time after it knew, or ought to have known, of such breach.

The request for samples from these 96 barrels was first given by plaintiff's letter of December 20, 1940, which we have already considered. Defendant contends that since all of the 96 barrels were distilled as early as July, 1937, except 37 barrels which were distilled in September of that year, plaintiff delayed too long before ascertaining the character of all of this whiskey and notifying defendant of any alleged breach. As already indicated, the weight of the credible evidence shows that whiskey of the kind specified in all of the receipts covering all but 37 of the 96 barrels, matures sufficiently after about two years from its distillation to enable its true character to be then ascertained. And it was generally referred to in the course of the trial as "light-bodied" whiskey to distinguish it from the 37 barrels of "heavy-bodied" whiskey, although the weight of the credible evidence respecting the requisite time before maturity of the latter type of whiskey does not differ. Defendant stresses the fact that plaintiff did not request any samples of any of the 96 barrels until December 20, 1940, that is, more than three years after the latest distillation of any of these barrels. We would not presently be concerned so much with the question of when the samples were requested as with the question as to how much time after they were received was plaintiff justified in taking before notifying defendant of any alleged shortcomings in the quality of the whiskey, except for the fact that these questions are so interdependent. On the question of limitations, we decided it was reasonable to allow not less than two years after distillation before inspecting the whiskey, that is, before asking for samples and that, therefore, a cause of action for breach of any warranty did not arise prior to the expiration of such a period. But on the different question now under consideration as to what plaintiff was obligated to do after acceptance of the whiskey in order to preserve its right to assert a breach of warranty as to the 96 barrels, since they were distilled in 1937 and since no samples were requested until the letter of December 20,

1940, that is, approximately a year and a half later than was the request for samples of the "contract" barrels, this request was a year too late, and a fortiori, any notification of rejection of these samples was too late.

Receipt of the samples was first acknowledged by plaintiff's letter of February 10, 1941, in which, as we have already seen by quotation from that letter, complaint was made that the samples did not appear by taste and smell to be up to the standard of heavy-bodied Owings Mills Maryland Rye Whiskey, but there was no actual rejection of the whiskey at this time. Then followed the further correspondence which we have already referred to at length in our consideration of the "contract" barrels, ending with plaintiff's letter of February 14, 1941. But even in this final letter plaintiff did not reject or state that it was going to reject the 96 barrels, but merely stated that: "We will write you later, without waiving any of our rights."

We, therefore, conclude that with respect to the 96 barrels, plaintiff failed, just as in the case of the "contract" barrels, to satisfy the requirements of the Uniform Sales Act which are made a condition precedent to a purchaser's right after acceptance of goods, to hold the seller liable for breach of warranty. With respect to the "contract" barrels, plaintiff made seasonable request for samples, but did not seasonably give defendant notice of rejection; whereas with respect to the 96 barrels, plaintiff's conduct was not seasonable in either respect. We might thus dispose completely of the entire case and render judgment for the defendant, were it not for the additional issue which plaintiff has raised with respect to the 96 barrels, namely, the claim that because of defendant's status as a warehouseman and its issuance or indorsement, or both, of warehouse receipts with respect to these 96 barrels, defendant is liable irrespective of the provisions of the Uniform Sales Act because of failure to use due care in the custody of this whiskey as well as because of breach of warranty of its merchantability and fitness for the intended use. As we have seen, defendant has denied any such negligence or breach of warranty while acting in the capacity of warehouseman.

It will be seen that this alleged liability of the defendant because of its status as

388

a warehouseman is twofold: (1) liability arising by virtue of the defendant's issuance or indorsement, or both, of warehouse receipts for the whiskey; and (2) liability arising by virtue of defendant's failure to exercise due care while the whiskey was in its custody. We will consider these points in the order in which they have been stated.

■ First, with respect to the effect of issuance and indorsement of the warehouse receipts: The receipts covering all of the 96 barrels were the defendant's own receipts and the receipts covering 47 of these barrels were drawn to defendant's own order and indorsed to third party purchasers. Thus, the defendant company, as respects all of the receipts covering all of the 96 barrels, is to be treated as a warehouseman within the meaning of that term under the Uniform Warehouse Receipts Act in force in Maryland at the time. Article 14A, Ann.Code of Maryland, §§ 1 to 60, inclusive. Under that Act a warehouseman may issue valid, negotiable receipts for his own goods. The warehouseman's liability is defined as follows (Section 20): "A warehouseman shall be liable to the holder of a receipt for damages caused by the non-existence of the goods or by the failure of the goods to correspond with the description thereof in the receipt at the time of its issue. If, however, the goods are described in a receipt merely by a statement of marks or labels upon them, or upon packages containing them, or by a statement that the goods are said to be goods of a certain kind, or that the packages containing the goods are said to contain goods of a certain kind, or by words of like purport, such statements, if true, shall not make liable the warehouseman issuing the receipt, although the goods are not of the kind which the marks or labels upon them indicate, or of the kind they were said to be by the depositor."

The receipts with which we are now concerned describe the whiskey merely as "Owings Mills Maryland Rye Whiskey," except the receipts for 37 barrels in which the additional words "heavy-bodied" appear. It must be conceded that had the defendant in the present case acted merely as an independent warehouseman of whiskey so labeled, of which it was not itself the manufacturer, the above section would apparently relieve defendant from any liability for inferior quality of the whiskey.

But here the defendant appears in a dual role—not merely as warehouseman but as manufacturer as well. The question, therefore, arises, does this alter the defendant's status with respect to liability? Defendant contends that it cannot for the reason that plaintiff is a mere sub-vendee of defendant and that, therefore, defendant is not liable to plaintiff. In short, it is defendant's contention that even if there were express or implied warranties by virtue of either the Uniform Warehouse Receipts Act or the Uniform Sales Act, running from the defendant to its immediate vendees, such warranties do not run with the goods; and that, therefore, a breach of them by the defendant cannot be availed of by the plaintiff; that at common law there is no warranty of the quality of the goods sold, and the maxim of caveat emptor applies; that whereas the Uniform Sales Act has changed this rule and established an implied warranty between manufacturer and dealer, nevertheless there is nothing in the Sales Act which extends to the consumer the warranty from the manufacturer to the dealer; that the ultimate consumer can never recover from the manufacturer except in an action in tort establishing the latter's negligence and that such right is itself limited to two types of cases: (1) Where the article or substance sold is imminently, inherently or essentially dangerous in its nature; and (2) in cases of contaminated food or beverages.

■ It is true that, with the above exceptions, it is settled law in Maryland, as well as in most jurisdictions, that the sub-purchaser has no right against the original seller for damages caused by defects in the quality of the goods. See Flaccomio v. Eysink, 129 Md. 367, 100 A. 510; Goldman & Freiman Bottling Co., Inc., v. Sindell, 140 Md. 488, 117 A. 866; Childs Dining Hall Co. v. Swingler, 173 Md. 490, 197 A. 105; Salisbury Coca-Cola Bottling Co. v. Lowe, 176 Md. 230, 4 A.2d 440, and Armour & Co. v. Leasure, 177 Md. 393, 395, 9 A.2d 572. However, as said in Williston on Sales, 2nd Ed., Sec. 244a: "If it be granted that a sub-purchaser as such is not entitled to the benefit of a warranty given to the original buyer, it yet may be asked may not the original seller by means of labels, advertisements or otherwise bind himself by a warranty to anyone who thereafter buys his goods. Certainly manufacturers often make representations to the

public, which if made directly to an immediate buyer would amount to warranties. The difficulties which most courts seem to feel in allowing the sub-purchaser a remedy is based on the assumption that the liability of a warrantor is contractual and, therefore, can only run directly between a purchaser and his immediate seller. This does not seem impressive as an original question. A warranty is in many cases imposed by law, not in accordance with the intention of the parties; and in its origin was enforced in an action sounding in tort, and based on the plaintiff's reliance on deceitful appearances or representations rather than on a promise, and where forms of action are still differentiated, an action of tort is generally allowed even at the present day. It must be admitted, however, that most courts would probably require the existence of a direct contractual relation."

The law of Maryland being as just stated in cases where the manufacturer has done no more than sell to the dealer, it still remains to be determined whether the rule is the same where, as in the present case with respect to the 96 barrels, the manufacturer, the defendant, through acting in the dual role of both warehouseman and manufacturer, has issued negotiable warehouse receipts for his own product, has labeled that product with a particular and well known trade name, and as respects the receipts covering 47 of these barrels, appears as indorser as well as maker of the receipts. By the section of the Warehouse Receipts Act just quoted (section 20), the warehouseman is not liable for failure of the goods to correspond with the description in the warehouse receipt if the goods are described merely by a statement or marks or labels upon them, or by a statement that the goods are said to be goods of a certain kind or by words of like import if such statements are true, even though the goods may prove not to be of the kind which the marks or labels upon them indicate, or of the kind they were said to be by the depositor. But this section obviously purports to deal with a "depositor" of goods who is not himself both the manufacturer and warehouseman of them, because certainly it cannot be presumed from the language of this section that such a person would be allowed to free himself of all liability merely by saying, for example, that the goods which he himself deposited after manufacturing them were

"said to be goods of a certain kind," when he knew they were not of that kind.

The Uniform Warehouse Receipts Act (Art. 14A, Ann.Code of Maryland, Sec. 44) provides as follows:

"A person who for value negotiates or transfers a receipt by indorsement or delivery, including one who assigns for value a claim secured by a receipt, unless a contrary intention appears, warrants:

"(a) That the receipt is genuine;

"(b) That he has a legal right to negotiate or transfer it;

"(c) That he has knowledge of no fact which would impair the validity or worth of the receipt, and

"(d) That he has a right to transfer the title to the goods and *that the goods are merchantable or fit for a particular purpose whenever such warranties would have been implied, if the contract of the parties had been to transfer without a receipt the goods represented thereby.*" (Italics inserted).

It will thus be seen that by virtue of this provision, the defendant warranted that the whiskey was merchantable or fit for a particular purpose, if such warranty would have been implied if the contract of the parties had been to buy and sell without resort to a receipt for the goods. A like provision is contained in the Uniform Sales Act, Ann.Code of Maryland, Art. 83, Sec. 54. We concede, as contended by defendant, that apparently the Uniform Sales Act does not purport to change the Maryland rule, just discussed, whereby manufacturer-vendors are not liable on either express or implied warranty except to actual purchasers from them, or to those purchasers in relation to whom they are estopped from saying that they do not stand in the relation of vendor; because, to be sure, the provisions of the Act covering remedies on breach of warranty include only a buyer and seller relationship. However, in the present case, the defendant, for all intents and purposes, does stand in a position equivalent to that of an immediate vendor with respect to the plaintiff by virtue of the defendant having issued and for value transferred or negotiated, by delivery or indorsement respectively, its own warehouse receipts for its own goods. Certainly, statements in a document of matters which are within a bailee's knowledge should estop him if the document is bought by a purchaser in reliance upon

such statements. See First National Bank of Chicago v. Dean, 137 N.Y. 110, 30 N.E. 1108. Similarly, where a carrier receives goods knowing that some are not in good condition and issues a bill of lading reciting that they are in good order, the carrier is not allowed to assert the contrary, where the bill of lading is in the hands of a purchaser for value. See New York Millinery & Supply Co. v. Hamburg-Amerikanische, etc., D.C., 171 F. 577. The Uniform Bills of Lading Act, in effect in Maryland, Annotated Code of Maryland, Art. 14, Secs. 1—55, contains a provision (Sec. 23) similar to that which we have quoted relative to the warehouseman's liability for false description in the receipt. See also the Pomerenc Act, Section 20, 49 U.S.C.A. § 100.

It would seem clear, then, that the defendant in the present case is to be considered as being in the same position as a seller under a simple contract of sale in so far as implied warranties are concerned. Such a seller's position is controlled by the Uniform Sales Act which provides as follows, Ann.Code of Maryland, Art. 83, Sec. 33:

"Subject to the provisions of this sub-title and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.

"(5) An implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usage of trade.

"(6) An express warranty or condition does not negative a warranty or condition implied under this sub-title, unless inconsistent therewith."

Subsections 2 and 5 above are pertinent to the present case. Subsection 2, it is to be noted, raises an implied warranty on the part of the manufacturer that the goods are of merchantable quality if bought by description from a seller who deals in goods of that description. In the present case, the defendant was the sole manufacturer of Owings Mills Maryland Rye Whiskey. This is the trade name of its product. Also, it is to be noted that subsection (5) raises an implied warranty as to quality or fitness for a particular purpose if such is in conformity with the usage of trade. The great weight of the credible evidence in the present case is that the name Owings Mills Maryland Rye Whiskey implied a whiskey of a particular quality; that it had a certain standard as regards proof, flavor, odor and aldehyde content; i. e., compounds intermediate between alcohols and acids. Also, the weight of the more credible evidence produced on behalf of the defendant as well as of the plaintiff is to the effect that practically all of the whiskey in suit (that in the "contract" barrels as well as in the 96 barrels) was not only very much below the usual standard of quality accepted in the trade of Owings Mills Maryland Rye Whiskey, but also a great deal of it was actually unmerchantable for blending or as straight whiskey. Indeed, considering the testimony of the experts as a whole, it is difficult to escape the conviction that, as testified by one or more of the witnesses, some of the whiskey was actually unfit for human consumption. For the most part it was low in proof, exceedingly musty, "off odor", peppery in taste and too high in aldehyde content which the weight of the credible testimony indicates should not exceed eight or ten grams per one hundred liters, whereas in most instances it was much in excess of this, and in one instance ran as high as 100.3 grams per one hundred liters.

However, in spite of this clearly demonstrated inferiority of the quality of the whiskey, the plaintiff is not entitled to recover under the theory which

we have just been considering, namely, that the Uniform Warehouse Receipts Act imposes liability upon the defendant independently of the effect of the Uniform Sales Act, because, as we have just seen, in its last analysis, the liability of the defendant under the former Act is governed by the provisions of the latter Act. Therefore, since plaintiff has failed to meet the requirements of the latter Act by failure, after acceptance of the goods, to give notice to the defendant of the breach of warranty within a reasonable time after he knew, or ought to have known of such breach, the defendant is absolved from liability. Unfortunately, plaintiff has been too dilatory in asserting what appears to be, otherwise, a very just claim. We see no escape from this conclusion. A warehouseman who has both manufactured and sold the goods to the person who stores them with him, is under no greater obligation to that person, as respects the quality of the goods, than if he had been only a manufacturer-vendor.

Finally, there remains to be considered the last theory advanced by plaintiff upon which it claims it is entitled to hold the defendant liable for the inferior quality of the 96 barrels of whiskey. This theory, as already pointed out, is one of negligence. It is based upon the following provisions of the Uniform Warehouse Receipts Act, (Ann.Code of Maryland, Art. 14A, Sec. 21): "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care."

By the weight of the credible evidence in the present case, we conclude that the plaintiff has not established that the defendant has been negligent, as defined in the section just quoted. It is true that there is some evidence to the effect that the low proof of some of the samples indicates probable faulty warehousing, particularly as regards temperature, and that such improper warehouse conditions were responsible in part for the unpalatable flavor of the samples. But the evidence in this respect amounts to little more than a suggestion or speculation that the warehousing was improper. Such testimony is of a most indirect character, being given by one or more of plaintiff's experts who did not actually see the warehouse conditions under which the whiskey in suit was stored. This evidence is totally unsupported by any testimony from those who would be in the best position to know the character of warehousing to which this whiskey was subjected, namely, the warehouse managers and watchmen themselves, including persons employed in similar capacity by the Government, or Government inspectors. In short, we believe that the greatly inferior quality of the whiskey has not been proved to be due to warehousing conditions; that its low proof, after maturing for four years, is due to its inferior ingredients and manufacture, and that such whiskey, even under warehousing conditions that are accepted as standard and proper in the trade, would not improve in proof to the extent asserted by plaintiff.

In the course of the trial there was some testimony to the effect that the 96 barrels are not, in fact, stored in defandant's own warehouse, as the warehouse receipts covering this whiskey recite, but are in the Terminal Warehouse. If this be true, it may be that defendant is liable under Section 166 of Article 27, and Section 50, Article 14A of the Maryland Annotated Code, making it a criminal offense to issue warehouse receipts for goods not actually received or under the warehouseman's control. But these are criminal provisions and so not involved in the present suit. Furthermore, the plaintiff is not here demanding delivery of the whiskey under the receipts, but on the contrary, seeks the right to reject it, and recover what it has lost by the purchase.

Plaintiff having failed to establish its right of recovery against the defendant, judgment must be entered for the latter.